[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The petitioner, Jorge Velez, is presently in the custody of the respondent, Commissioner of Correction, after being sentenced in G.A. # 17 for the following offenses: burglary occurring on May 20, 1994, in violation of General Statutes § 53a-103 and failure to appear on July 14, 1994, in violation of General Statutes § 53a-172, Docket Number CR17-87138; larceny in violation of General Statutes § 53a-125b occurring on June 29, 1994, Docket Number CR17-88522; larceny in violation of General Statutes § 53a-125a occurring on July 8, 1994, Docket Number CR17-88523; robbery in violation of 53a-135 occurring on November 30, 1994, Docket Number CR17-89426. (Respondent's Exhibit F.) On July 21, 1995, the petitioner was sentenced for all these offenses. (Respondent's Exhibit. F.) The controlling sentence is eight years, suspended after the service of three years, with three years probation, for the November 30, 1994 robbery. (Amended Petition, ¶ 13.) The other sentences were ordered to run concurrently. (Amended Petition, ¶ 10) sentences were ordered to run concurrently. (Amended Petition, ¶ 10.)
On April 29, 1997, the petitioner filed this petition for a writ of habeas corpus in the Judicial District of New Haven at New Haven. On August 28, 1997, the petitioner filed an amended petition claiming that "his confinement is unlawful in that the respondent, as the result of his failure to use posted credits to reduce the Petitioner's release date, has held and confined the Petitioner beyond his lawful release date." (Amended Petition, ¶ 27.) On October 16, 1997, the respondent filed a reply. After a request for an expedited hearing, the matter was transferred to this court on October 29, 1997. On November 13, 1997, the respondent filed a motion to dismiss pursuant to Practice Book § 529H claiming the court has no subject matter jurisdiction and that the petitioner failed to state a legally cognizable claim. The matter was heard by this court on November 14, 1997 and November 26, 1997.
Respondent's Motion to Dismiss
The respondent challenges this court's subject matter jurisdiction to hear this matter. "Unlike jurisdiction over the person, subject matter jurisdiction cannot be created through consent or waiver. . . . Once the question of lack of jurisdiction of a court is raised, it must be disposed of no matter in what form it is presented. . . . The court must fully resolve it before proceeding further with the case. . . . CT Page 13159 Whenever a court finds that it has no jurisdiction, it must dismiss the case, without regard to previous rulings. . . ." (Citations omitted; internal quotation marks omitted.) Vincenzov. Warden, 26 Conn. App. 132, 135, 599 A.2d 31 (1991). Further, the court stated that "[s]ince it is clear than an inmate has no liberty interest in or right to parole release, it follows a fortiori that he cannot invoke a court's subject matter jurisdiction in a habeas action. . . ." (Citation omitted.) Id., 143. "Subject matter jurisdiction for adjudicating habeas petitions is conferred on the Superior Court by General Statutes § 52-466, which gives it the authority to hear those petitions that allege illegal confinement or deprivation of liberty." Abed v. Commissioner of Correction, 43 Conn. App. 176,178, 682 A.2d 558, cert. denied, 239 Conn. 937, 684 A.2d 707
(1996). In a case involving a claim alleging a loss of good time credits the court in Abed determined that since the petitioner had alleged a loss of prospective good time credits, there was subject matter jurisdiction, but since there was no liberty interest in unearned good time credits, he failed to state a legally cognizable claim upon which relief may be granted. Id., 182.
The petitioner alleges[1] that the respondent has posted statutory good time on the petitioner's time sheet, but has failed to credit that posted statutory good time. The petitioner claims that this is due to the respondent's mistaken application of General Statutes § 18-100d. While the petitioner has not specifically pleaded that the posted good time would have been earned good time but for the interpretation of General Statutes § 18-100d applied by the respondent, it is certainly clearly implicit in the allegations. The court finds the facts sufficiently alleged to state a cause of action over which this court has subject matter jurisdiction.
 I CLAIMS OF THE PARTIES
The petitioner has alleged in his complaint that he has earned good time credits pursuant to various Connecticut statutes and if these credits had been applied by the respondent as statutorily required, the petitioner's release date from incarceration would have been in April, 1997 rather than on December 17, 1997. The release date of December 17, 1997 represents the petitioner's release date if the maximum term of CT Page 13160 the sentence imposed by the sentencing court on the underlying charges is served. The petitioner alleges that the respondent has misinterpreted General Statutes § 18-100d and other provisions of Public Acts 1993, No. 93-219, which has resulted in his prolonged and unconstitutional incarceration.
The respondent replies that he has correctly and appropriately construed the provisions of General Statutes §18-100d, which eliminated good time credits for those who committed a crime on or after October 1, 1994. Since the petitioner was sentenced on July 21, 1995, for a crime committed on November 30, 1994 to a total effective sentence of eight years suspended after the service of three years, it is the respondent's contention that the petitioner is not entitled to good time credits.
 II BACKGROUND
It has long been permitted by statute in Connecticut for certain prisoners to earn a reduction in the length of their sentence for good time. That is, where there has been good behavior or employment, "there may be a commutation of the total length of sentence that must be served."[2] Laden v. Warden,169 Conn. 540, 541, 363 A.2d 1063 (1975).
In 1993, the state legislature passed P.A. 93-219, entitled AN ACT CONCERNING PAROLE. This public act contained fourteen sections, three of which are of primary significance in resolving the issues presented in this matter. Section 10, codified into General Statutes § 18-100d, was a new provision mandating that inmates shall be under the supervision of the respondent or the board of parole until the expiration of the maximum term to which they were sentenced.[3] Section 1 was an amendment of General Statutes § 18-100c, in which the legislature extended the community release eligibility to inmates sentenced to two years from one year and added a reference to several good time statutes.[4] Section 6, codified as General Statutes § 54-124c, was a new provision giving to the board of parole the authority to supervise all inmates released from confinement until their sentence was complete, except for those on community release which remain under the supervision of the respondent.[5]
On June 22, 1994, the respondent sought advice from the CT Page 13161 attorney general as to what extent General Statutes § 18-100d
affected the computation of discharge dates for sentences subject to that statute. On November 23, 1994, the attorney general issued his opinion that for sentences subject to the statute, the maximum term is not reducible by good time credits which are earned during either pre- or post-sentence confinement. (Respondent's Exhibit E.)
 III FINDINGS OF FACT
Most of the relevant facts in this matter are undisputed. Both petitioner and respondent agree that the petitioner was sentenced on July 21, 1995, after the passage of P.A. 93-219, to a sentence of eight years execution suspended after the service of three years with a three year period of probation. The parties agree that the maximum release date of the petitioner, if the full sentence imposed by the sentencing court is served, is December 17, 1997. Additionally, the parties agree that, if the petitioner's claim is correct and he is entitled to a good time reduction in his sentence, the petitioner would have been released in April of 1997, some eight months ago.
The parties, although disagreeing as to the import, stipulated to the admission of a number of exhibits which included legislative history and records, the attorney general's opinion, and the mittimuses relevant to the petitioner's incarceration. Additionally, the respondent offered as an exhibit the notice of the petitioner's denial of parole on February 9, 1996. The respondent also offered the testimony of two department of correction officials.
The first witness, Michelle DeVeau, is a record specialist for the department of correction who provides technical advice with respect to the calculation of prisoner's sentences. DeVeau testified as to the steps taken by the respondent in establishing a time sheet once it receives the mittimus on a newly sentenced prisoner. She testified that the first item to be determined is the maximum release date for the prisoner. An important factor in determining this date is the date of the offense. Another important factor is the amount of any pre-sentence incarceration served by the petitioner. In the petitioner's case since the offense date of November 30, 1994 is after the October 1, 1994 date set forth in P.A. 93-219, she testified that the computer is CT Page 13162 programmed not to reduce the sentence by good time credits.
In describing the petitioner's time sheet, (Respondent's Exhibit G), DeVeau testified that it indicates that the petitioner has accumulated seventy one days of good time for his pre-sentence incarceration which is arrived at manually by the staff dividing the length of pre-sentence incarceration, 215 days, by three. This is done by the staff rather than the computer because the computer is presently incapable of handling that function. DeVeau also testified that the computer cannot distinguish between "earned" good time and "posted" good time.[6] She described the petitioner's time sheet as reflecting a maximum release date of December 17, 1997. Further she testified that the computer is merely a repository of information and is incapable of applying the information to specific prisoner scenarios in order to determine eligibility for parole, transitional supervision, or the application of good time credits. These determinations must be done manually by records personnel by utilizing the data on the time sheet generated by the computer. Finally the witness testified that the department in the petitioner's case did not credit him with any good time off the maximum sentence because, in accordance with P.A. 93-219, the petitioner was not eligible having been convicted of an offense that occurred on or after October 1, 1994. On cross examination the witness indicated that in large part the interpretation that the department gives to P.A. 93-219 is derived from the Opinion of the attorney General rendered on November 23, 1994, (Respondent's Exhibit E), in response to the Commissioner of Correction's inquiry dated June 22, 1994.
Additionally Fred Levesque was called as a witness by the respondent. Levesque is the director of classification for the department of correction. His duties are to oversee all the operations of classifying of inmates, providing training to staff, and providing technical assistance. The classification process is utilized to insure that inmates are assigned and housed in the appropriate level facility. Levesque testified that there are five levels of confinement. The highest level of security is designated as level five and the lowest is level one. Level one is also known as community confinement. Levesque testified that those prisoners who have been sentenced to terms of two years or less may be transferred to community confinement through a process known a transitional supervision[7] review. Levesque testified that within fourteen days of when an inmate first arrives at the institution a determination is made as to CT Page 13163 whether he is transitional supervision eligible. If the inmate is so eligible, then the inmate is notified of the approximate transitional supervision eligibility date. Transitional supervision is the successor program to supervised home release which has been phased out. Supervised home release and transitional supervision have many similarities. Levesque further testified that the petitioner had been denied parole in February, 1997 and was not eligible for the transitional supervision program since he had been sentenced to a term of more than two years. Therefore the only other "supervision" that the department has available is incarceration. Additionally the witness testified that his department utilizes the information contained on the computer generated time sheet to determine whether the inmate is eligible for transitional supervision if incarcerated on a sentence of two years or less or, if sentenced for more than two years, the information is used in evaluating the inmate for furlough eligibility. Further the witness testified that there are presently approximately 10,000 prisoners who are incarcerated for offenses that were committed on or after October 1, 1994.
The court found the testimony of both DeVeau and Levesque to be credible and accepts their testimony as to the policies of the department and the status of the petitioner, and the capabilities or lack thereof of the computer system.
 IV DISCUSSION
A. Legislative History
Both parties claim that the public act in question is sufficiently clear so that the court need not delve into the legislative history in order to determine the intent of the legislation. [Petitioner's Brief p. 8, Respondent's Post-trial Brief, p. 3.] Our Supreme Court has consistently held that where the language of the statute is clear and unambiguous, there is no need to consider the legislative history because it is presumed that the intention is expressed in the legislation. Sutton v.Lopes, 201 Conn. 115, 118-119, 513 A.2d 139, cert. denied sub nom. McCarthy v. Lopes, 479 U.S. 964, 107 S.Ct. 466,93 L.Ed.2d 410 (1986). See Samperi v. Inland Wetlands Agency, 226 Conn. 579,590, 628 A.2d 1286 (1993); Mazur v. Blum, 184 Conn. 116, 118-19,441 A.2d 65 (1981). The court agrees that the plain language of the statute is unambiguous, despite the fact that the parties CT Page 13164 have conflicting interpretations of the same language.
B. Plain Language of the Statute
The petitioner argues that since the legislature failed to include a provision in General, Statutes § 18-100d
specifically eliminating the availability of good time, this court should not interpret the statute as doing so. General Statutes § 18-100d reads in relevant part: "[n]otwithstandingany other provision of the general statutes, any person convicted of a crime . . . shall be subject to supervision by personnel of the Department of Correction or the Board of Parole until the expiration of the maximum term or terms for which he was sentenced." (emphasis added). The court finds this language to be a clear expression that no statute, including statutes providing good time credits, shall reduce the sentence of any person who committed a crime on or after October 1, 1994.
Having determined that the legislature has clearly and unequivocally expressed its intent to require a convicted person to serve his full sentence as imposed by the sentencing court, we now turn to the issue of what good time in Connecticut means and how it was effected by P.A. 93-219.
Good time is described in General Statutes § 18-7 et seq. as a diminution or commutation of one's sentence. The diminution or commutation that is contemplated by General Statutes § 18-7, § 18-7a, § 18-98a and § 18-98b involves a shortening of the sentence.[8] None of the good time statutory sections referenced contemplates anything other than a reduction of the length of the sentence. Thus, it is clear that good time credits in Connecticut have not traditionally nor do they presently effect the nature of the sentence or the type of custody or supervision required. They only effect the length of the sentence.
The petitioner, in this matter, is therefore, presented with a dilemma. On the one hand, General Statutes § 18-100d is clear that the maximum sentence imposed by the trial court must be served. On the other hand, good time credits have traditionally been used to reduce the "length" of the sentence as previously noted. These two concepts come into conflict with one another if, as the petitioner argues, General Statutes § 18-100d
did not eliminate good time credits. Faced with this dilemma, the petitioner suggests that General Statute § 18-100d was not CT Page 13165 intended by the legislature to reduce the maximum sentence imposed by the trial court. Rather, he suggests that a "release from custody" date or a "commencement of supervision date" is created. The good time credits earned are used to establish a date when the petitioner is released from the custody of the department of correction and his supervision by the board of parole commences. Thus, according to the petitioner, the provisions of General Statutes § 18-100d requiring service of the maximum term of the sentence are not violated.
While this is an interpretation of the statutes, it is one the court cannot accept as the expressed intent of the legislature. First, the petitioner is effectively arguing that the legislature, by passing General Statutes § 18-100d intended to create a second type of good time credit which is distinct from the traditional concept of good time credit that effects the length of the sentence. There is no indication that this was the legislature's intent. General Statutes §§ 18-7 and 18-7a, in defining good time credit, were not amended by P.A. 93-219 to change the traditional concept that good time credits effect the length of the sentence. Additionally, in passing P.A. 93-219, the legislature amended General Statutes § 18-100c to ensure that inmates sentenced to two years or less received the traditional good time credits which reduced the length of their sentence. That same public act created General Statutes § 18-100d, but did not indicate any intent to create this newer form of good time credit that the petitioner urges this court to adopt.
The petitioner also attaches special significance to the lack of the use of the word "parole" in General Statutes § 54-124c. (Petitioner's Brief, p. 7.) He interprets this to mean that there is no longer any need to grant parole in the context of General Statutes § 54-124c but rather, coupled with General Statutes § 18-100d, the board of parole shall supervise the individual after a mandated release from custody of the department of correction. Reading General Statutes § 18-100d
and General Statutes § 54-124c together, the petitioner envisions the following scenario. The petitioner's release would be mandated as of April of 1997, after taking into account good time credits. Then, pursuant to General Statutes § 18-100d
and General Statutes § 54-124c, he would automatically be placed under the supervision of the board of parole until December 17, 1997. The court finds that the petitioner is misconstruing P.A. 93-219 and the purpose of General Statutes § 54-124c. CT Page 13166
Prior to the passage of P.A. 93-219, the board of parole was a part of the department of correction. Taylor v. Robinson,171 Conn. 691, 696, 372 A.2d 102 (1976). P.A. 93-219 established an autonomous board of parole. See P.A. 93-219, §§ 6, 7, 8, 10, 11. As part of the establishment of this newly independent board, the legislature needed a mechanism to clearly manifest its intent to transfer the supervision of those who were released from the custody of the respondent to the board of parole. Therefore, Sections 6 and 14 of P.A. 93-219, codified as General Statutes § 54-124c, was the mechanism used to ensure that the supervision of those released was an enumerated responsibility of the board of parole.
Thus the petitioner's attempt at devising a new form of supervision which he claims is not parole is an interpretation of54-124c that is neither expressed nor can it be reasonably interpreted as such. The petitioner states: "[s]imply stated, section 6, codified as C.G.S. 54-124c is the enabling legislation for individuals to be released, AND SUPERVISED FOR THE FULL TERMOF THEIR SENTENCE, without being granted parole." (Petitioner's Brief, pp. 6-7.) Even assuming arguendo, that the petitioner is correct, the question arises as to what the terms of the supervision are and how they are established. If this is not parole, as suggested by the petitioner, but some new form of supervision then the legislature has failed to provide a mechanism in the statutes for setting the terms of the supervision and for notification to the petitioner of those terms. These issues are left unanswered if the petitioner's argument is brought to a logical conclusion. The court agrees that it should seek to give meaning to each word and phrase in the enactment, if possible, so that no word becomes superfluous.Hayes v. Smith, 194 Conn. 52, 58, 480 A.2d 425 (1984). Additionally, the court agrees it should not seek to add language where none was supplied by the legislature and there is no indication that there was an intent to do so. Id. If the statutory scheme can be read in a logical and reasonable manner as a consistent scheme, it should be read in such a manner.Fairfield Plumbing Heating Supply Corp. v. Kosa, 220 Conn. 643,650, 600 A.2d 1 (1991); Turner v. Turner, 219 Conn. 703, 713,595 A.2d 297 (1991). In considering all of the sections of P.A. 93-219
along with the general statutes previously cited regarding good time the legislative intent is clear. The legislature sought to establish an independent board of parole vested with the power to determine who was eligible for parole and the conditions of parole as well as the power to supervise any parole that was CT Page 13167 granted to a prisoner. It eliminated good time credits for any prisoner who committed a crime on or after October 1, 1994. For those prisoners incarcerated on or after July 1, 1993 for two years or less, however, the legislature allowed good time credits and the possibility of release to community programs.
C. Equal Protection and Due Process
The petitioner also urges this court to find that the petitioner's right to equal protection would be violated if General Statutes § 18-100d is interpreted to eliminate good time credits. In support of this argument, the petitioner suggest that the "strict scrutiny" test should be used to determine if the interpretation passes muster. Alternatively, he argues that the respondent's interpretation of the statutes in question cannot withstand the rational basis test. This court knows of no fundamental right to good time credits nor is it aware of any suspect classification that is established by these statutes. Therefore, the test to be employed is whether the legislation is rationally related to a legitimate state purpose.
The court agrees with the respondent's analogy of this case to Montanez v. Connecticut Board of Parole, Civ. No. 2:91CV00126, et seq. (D.Conn. May 29, 1992)(Clarie, J.). The court stated that: "In the case at hand, this court can reasonably presume that in deciding to disqualify the most serious crimes, i.e., Capital felony, felony murder, arson murder or murder from consideration for parole, the legislature was acting in pursuit of the legitimate state interest of protecting the safety; and welfare of society. See United States v. House, 939 F.2d 659, 664
(8th Cir. 1991) (a higher penalty for a more severe offense does not violate equal protection). The legislative means are rationally related to a legitimate government purpose.
"The legislature had the further legitimate goal of not encroaching on the judiciary's sentencing authority. Frazier v.Manson, 703 F.2d at 35."
Therefore, the petitioner's equal protection claim must fail.
As to the petitioner's due process claim, the petitioner has failed to brief this issue and leaves the court with little understanding of what this claim entails. While the court can consider this argument waived by the petitioner, the court will assume that the claim is that good time credits were earned and CT Page 13168 that the petitioner was deprived of the benefit of those credits without a hearing. Since the court has determined that the petitioner was not eligible for good time credits, this argument must also fail.
For all of the foregoing reasons, the petition is dismissed.
Zarella, J.